COLUMBUS BAR ASSOCIATION *v.* DEVILLERS.

[Cite as *Columbus Bar Assn. v. DeVillers,*
116 Ohio St.3d 33, 2007-Ohio-5552.]

(No. 2007–1148—Submitted August 14, 2007—Decided October 24, 2007.)

**Per Curiam.**

{¶ 1} Respondent, Sean Patrick DeVillers of Lexington, Kentucky, Attorney Registration No. 0066963, was admitted to the Ohio bar in 1996. The Board of Commissioners on Grievances and Discipline recommends that we suspend respondent's license to practice law for a period of two years, followed by a two-year probationary period with conditions, based on findings that he committed several disciplinary violations. On review, we adopt the board's findings of misconduct and recommended sanction.

{¶ 2} On November 13, 2006, relator, Columbus Bar Association, filed a seven-count amended complaint charging respondent with several violations of the Code of Professional Responsibility. Respondent stipulated to the violations of the Disciplinary Rules in each count. A panel of the Board of Commissioners on Grievances and Discipline held a hearing on the complaint in April 2007. Based on the stipulations and other evidence, the panel made findings of fact, conclusions of law, and a recommendation, which the board adopted.

Stipulated Facts

*Count I*

{¶ 3} In 1999, respondent drafted a will for Marjorie Holland that named her brother, John Holland, the primary heir of the estate. The deed to the house in which Marjorie lived was in her and John's names as joint tenants with rights of survivorship. Marjorie died in 2001.

{¶ 4} Respondent, who was the executor of Marjorie's estate, filed the estate inventory but failed to properly research the real estate title and did not realize that the property was not an estate asset, because it had passed to John upon Marjorie's death. Believing the real estate to be an estate asset, respondent sold the property in August 2001 to the listing real estate agent for $115,000 less a six percent commission. The property had an appraised value of $168,000, and the real estate agent resold the property two years later for $216,000.

{¶ 5} In addition, respondent failed to list as an estate asset a $23,922 mortgage that John had executed on the property in 1991. Respondent signed a release of the mortgage without determining whether John had ever repaid the money he owed from the 1991 mortgage.

{¶ 6} Respondent subsequently paid 50 percent of the real estate proceeds to Marjorie's estate and 50 percent to John. Yet respondent failed to pay Marjorie's

funeral expenses on time, causing late fees of $1,211 to be added to the bill. Respondent also paid the funeral bill from his personal account rather than the estate account.

## Count II

{¶ 7} John Holland lived in a nursing home before and after the death of his sister, Marjorie. In June 2001, John signed a power of attorney giving respondent authority to manage his financial affairs, including payment of bills relating to his comfort and well-being.

{¶ 8} In October 2002, respondent opened an account for John and deposited $52,268, John's 50 percent share of the real estate sale described in Count I, and $29,962 from Marjorie's estate. However, on numerous occasions, respondent failed to pay for medical and pharmaceutical services provided to John, causing certain service providers to threaten to terminate services. Respondent also failed to pay John's nursing home expenses on time and did not timely respond to the nursing home's attempts to contact him. John revoked the power of attorney in January 2004.

## Count III

{¶ 9} In 1998 or 1999, respondent assumed responsibility for probating the estate of Margaret Dickerson, which included National City Bank common stock and an interest in the National City Bank Dividend Reinvestment Program. Respondent failed to list stock dividends from the dividend-reinvestment program in the account and did not distribute them at the closing of the estate. In fact, the dividend-reinvestment program remained open for four years after the estate was closed. In addition, after Dickerson's death, respondent took possession of 11 pension checks written to Dickerson but neglected to deposit them or ask to have them reissued.

## Count IV

{¶ 10} Respondent left the law firm of Christensen, Christensen & DeVillers in December 2003. Respondent continued to represent clients but failed to disclose that he no longer carried malpractice insurance and failed to have the clients sign the notice required by DR 1–104(A).

## Count V

{¶ 11} In 2004, the Franklin County Probate Court appointed Douglas Wrightsel as a master commissioner to review five estate matters then being handled by respondent. Wrightsel's report concluded that there was delay, neglect, and

missing paperwork. Respondent was able to complete the work on these estates with Wrightsel's direction and help.

## Count VI

{¶ 12} Respondent did not maintain a trust account or a separate business account. Instead, respondent used his personal account for business and non-business purposes, including the payment of client court costs. Respondent also did not keep an accounting of client funds deposited into his personal account.

{¶ 13} While working with Christensen, Christensen & DeVillers, respondent deposited $10,500 into the firm's trust account on April 3, 2003, without recording which client the deposit related to. In May 2003, respondent made two withdrawals totaling $10,500, also without notation. When asked by firm members for details of the disbursements, respondent indicated that they were made to David Dorward and Baycliff Village Home Owners Association. In reality, one check for $7,748.18 was made payable to Provident Bank and the other check for $2,751.82 was made payable to respondent.

## Count VII

{¶ 14} Sometime around April 2004, respondent defended Steven and Donald Slivka in a lawsuit to collect on a loan. Respondent entered an appearance and filed a motion for leave to file an answer. This motion stated that respondent had requested and received an extension of time to file an answer. However, when he received a motion for default judgment, respondent discovered that the extension had not been journalized.

{¶ 15} The case was scheduled for trial in July 2004. After several continuances, the judge entered an order in January 2005 indicating that the case had been settled, based upon respondent's representations to opposing counsel that respondent had the settlement money in his trust account. However, respondent's clients had not authorized any settlement.

{¶ 16} As a result, the case was put back on the docket. A pretrial conference was scheduled for August 2005. Respondent had by then moved but had failed to provide the court with his new address.

{¶ 17} In October 2005, respondent sent a proposed settlement agreement to opposing counsel, although according to Steven Slivka, respondent did not have authority to settle the lawsuit. Nevertheless, the case was ultimately dismissed in December 2005 based upon representations of counsel that the parties had resolved their dispute.

{¶ 18} In January or February 2006, respondent informed Steven Slivka that the Slivkas would likely have to pay some money. Respondent said he would contact them later about the amount they needed to pay. However, respondent

never contacted the brothers. In June 2006, Steven Slivka's wages were garnished. The sheriff also executed on the Slivkas' property.

## Stipulated Misconduct

{¶ 19} Respondent admitted, and the board found, that respondent had violated DR 1–102(A)(4) (forbidding engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(6) (prohibiting conduct adversely reflecting on the lawyer's fitness to practice law), 1–104(A) (requiring disclosure to clients that a lawyer does not carry professional-liability insurance), 6–101(A)(1) (forbidding handling a legal matter that a lawyer is not competent to handle without associating with a lawyer who is competent to handle it), 6–101(A)(3) (forbidding neglect of an entrusted legal matter), 7–101(A)(1) (forbidding intentionally failing to seek a client's lawful objectives), 7–101(A)(2) (forbidding intentionally failing to carry out an employment contract), 7–101(A)(3) (forbidding intentionally prejudicing or damaging a client during the professional relationship), and 9–102(A), (B), and (E) (requiring preservation of the identity of funds and property of clients).

## Recommended Sanction

{¶ 20} In recommending a sanction, the board considered the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 21} As aggravating factors, the board found that respondent had engaged in a pattern of misconduct and that there were multiple offenses. BCGD Proc.Reg. 10(B)(1)(c) and (d). In addition, respondent refused to acknowledge the wrongful nature of his misconduct. BCGD Proc.Reg. 10(B)(1)(g). The board also noted the vulnerability of and resulting harm to the victims of respondent's misconduct and respondent's failure to make restitution. BCGD Proc.Reg. 10(B)(1)(h) and (i).

{¶ 22} In mitigation, the board noted the absence of a prior disciplinary record, respondent's cooperation in the disciplinary investigation, and his character and reputation. BCGD Proc.Reg. 10(B)(2)(a), (d), and (e).

{¶ 23} Respondent testified that he was diagnosed with attention deficit disorder as a child. Respondent explained that his disorder was not an excuse for his actions but that it did make it very difficult to stay focused and to address matters in a timely fashion. Respondent further testified that after an Ohio Lawyers Assistance Program intervention to determine the cause of his problems, he was diagnosed with adult attention deficit disorder and general anxiety disorder and was under the care of a psychiatrist for a year.

{¶ 24} Because respondent did not provide expert testimony on his condition, the board was unable to find that his attention deficit disorder caused or contributed to any of the charged misconduct. The board did, however, recognize that respondent was diligent in accepting treatment and removing himself from the traditional law-firm environment by accepting employment as a financial analyst and in-house counsel.

{¶ 25} The panel recommended that respondent be suspended from the practice of law for two years and, if respondent is reinstated, that he serve a two-year monitored probation under Gov.Bar R. V(9). The panel also recommended that respondent reimburse the Client Security Fund for any amounts paid to respondent's clients. It also recommended as a condition of reinstatement that respondent present a written statement from a physician indicating that he is fit to practice law despite his prior diagnosis. The board adopted the panel's recommendation.

### Review

{¶ 26} Respondent does not challenge the board's findings of misconduct or the recommended sanction. We have reviewed the board's record and its report, and we agree that respondent violated DR 1–102(A)(4), 1–102(A)(6), 1–104(A), 6–101(A)(1), 6–101(A)(3), 7–101(A)(1), 7–101(A)(2), 7–101(A)(3), and 9–102(A), (B), and (E). We also agree that the board's recommended sanction is appropriate. Accordingly, respondent is hereby suspended from the practice of law for two years, to be followed by a two-year period of monitored probation under the terms of Gov.Bar R. V(9) upon reinstatement. Prior to reinstatement, respondent must present a written statement from a physician indicating that he is fit to practice law. We also order that respondent reimburse the Client Security Fund for the amounts paid to respondent's clients for any claims made in connection with the above misconduct. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

---

Barbara J. Petrella, Bruce A. Campbell, and A. Alysha Clous; and Roetzel Andress, L.P.A., and Judith D. Levine, for relator.

Bricker & Eckler, L.L.P., and Alvin E. Mathews Jr., for respondent.